220-9003. And the rules are generally the same here on Zoom. You'll each have 15 minutes to argue. The appellant will have time to reserve for rebuttal. I'm going to keep time and I suggest that you do the same, just so you're not surprised. Okay. So appellant's counsel, do you want to reserve some time? I do not, your honors. I respectfully thank you though. I appreciate it. Okay. All right. Thank you. All right. So we'll hear from you counsel. Thank you, your honors. May it please the court. Good morning. My name is Ryan Lysett. I'm here on behalf of respondents. John Wetzel, Jamie Sorber, Mark Garment. I'm with the Dauphin County district attorney's office. And your honors at this stage of review, you know, when the state cases make their way to the federal courts, I always feel like it's the, we're at the splitting the atom stage of the case here and that the review is occurring under such a fine microscope. You know, now that we've had the benefit of years of time to review everything and build the cases and what it boils down to though, is whether the state's determination was reasonable. And, you know, boiling down the state of case law as it exists with regard to a defendant's right to choice of counsel, it's arbitrariness on the trial court's behalf versus, you know, any dilatory tactics that the defendant engages in, which, you know, it seems to be diluted to, to me. And. The record in this case is just, you know, obviously from respondents perspective, overwhelming with regard to Mr. Randolph's dilatory tactics in this case. Well, hold on now. Let's, let's dig in a little bit. We're reviewing the Supreme court's decision, right? The Pennsylvania Supreme court. Right. That's what I meant. You know, I can't help, but notice that would you call dilatory tactics? You know, there's no mention of any breakdown in communication. The Supreme court just didn't mention it at all. I mean, how can we get by that? Isn't that important? I would go so far as to admit that I was going to use the word a nasty breakdown, but I'm going to backtrack and strike that comment and say, yeah, I mean, this is one of those cases where you had a defendant, an attorney that just aren't communicating at the end of the day. And, you know, it's even persisted with the, the exceptional counsel that Randolph currently has. I mean, it's continued in the district court with them. Randolph filed motion, seeking to have them removed at least at one point, I know there was several ex parte matters that occurred. So I wasn't privy to that. I just know based on docket entries that it did happen and it essentially boils down to, you know, kind of tying into the third issue here, waiver, you know, tacit waiver, waiver by conduct. It's almost like he's just conducting a hunger strike until he is appointed this Sam Stratton, who again is an amazing attorney. As I read the record, Mr. Randolph actually objected to a continuance and was repeatedly asking that the trial move forward in a timely way. As soon as there were funds available to engage Mr. Stratton, he put in his notice of appearance. And at that point, the trial court was unwilling to, to delay, whether you look at it as three hours or what boiled down at the end of the day to about 50 minutes. How is that dilatory tactics on the part of Mr. Randolph? Sure. Your honors. And I, again, you know, if you take attorney Thomas's testimony at the habeas hearing Sam or his family intended for attorney Stratton to possibly even enter his appearance as early as the preliminary hearing, there was more concrete discussions of that in the January before the May trial term, where it seems like as far as attorney Stratton understood, that's where the family intended to represent them. As far as attorney Stratton said at the end of the day, it came down to the money. I know that he was notified by the Randolph's beforehand that they did sell the bar. That bar was never sold. Attorney Stratton admitted at that habeas hearing that he never would have, you know, meaningfully conducted the representation with a couple thousand dollars that they were able to come up with. What relevance do those after the fact events and post conviction testimony at the, at, at the habeas hearing have to do with ed pediferance? Are we looking at what was known to the state, the trial court at the time? I still think that they arrived at a reasonable conclusion, your honor. I'm sure they might not have the benefit of this post hoc, all this stuff that has happened, but nothing has since come out. He put on two more witnesses at the habeas hearing and the attorney Stratton conceded that he would have essentially had to build a Mr. Randolph's case from the ground up. Sure. Let me back up from it. Are you, are you arguing that it was a reasonable conclusion that a 50 minute delay should not have been granted to Mr. Stratton? Sure. That's what we're talking about. That's what judge crafts. I think it's focused on a 50 minute delay. You're saying that was not unreasonable. Well, that's not ultimately what, sure. That's what he was asking for, but that's not what he would have been able to try this case on. He said he needed to hire all these investigators. He didn't even have discovery at the time of sentencing your honor. And so I know it's hard to parse this. Decision that was made by the state court at the time, but everything that's come out has just only reinforced the reasonableness of the state court's conclusion. And if you want to talk about delay, I mean, Let's talk about this, the Supreme court's opinion, right? I mean, the district court was troubled. I think is a charitable way of saying it. With the one paragraph discussion. Of this choice of counsel issue. And quite frankly, the lack of factual support under underpinning his. The Supreme court's conclusion. What's your position on that? Well, the transcripts will reflect that. And attorney. Stratton's discussions with Randolph. Mr. Randolph. Before trial, Mr. Attorney Stratton told Randolph straight up. He was going to need to request. A continuance in his matter to bring himself up for speed. Sure. I mean, The opinion thoroughly addresses and as in depth as we are in this. Almost splitting the Adam stage of review now. No, but everything that's come out. He has not pointed to any evidence except for these two witnesses. He was able to present. At the habeas hearing to demonstrate that. I think. At the end of the day, anything would have been different. I mean, We're going to be as Jerry Reeves. We were, we're going to be in the same position at a retrial and your honors, I would submit that the Commonwealth. Due to the death of witnesses and the passage of time is extremely prejudiced here. With results of this retrial. I mean, fortunately we were able to retry. Is that an issue? Is that even an issue? If we find structural error here. I don't know. I don't know if it's a structural error. No. But, you know, I, I, I would be loath not to, you know, at least make the Commonwealth's position known. And again, When we consider everything that's been condensed here and juiced out and these allegations of an effectiveness. I know that the court didn't really make any, the district court didn't make any determinations with regard to. The merits of any of those claims and what new evidence could be presented, but I mean, Talking about completeness of the record we've now developed at the hearing. Trial counsel wasn't even present. And I know it wasn't a typical ineffectiveness of counsel. Again, we're talking about structural errors, not. Harmless errors. You know, when we characterize it in that light, but. He didn't even present a trial counsel's testimony, which under Pennsylvania law, I get it. We're not under Pennsylvania law anymore here, but it's just insufficient to establish any claim. And so. Yes. I mean, of course, in trial counts, one of these situations, a lot of them do have this. Continuing duty, which is a good ethical thing to assist their clients in any way. So maybe he would have. Said that this breakdown was as bad as the record reflected. Maybe he would have said that it wouldn't have, I mean, we can't know. They had the opportunity. During the hearings, like the, even the January hearing. I think that, that Mr. Welch confirmed that there was a real problem in communication. I mean, it happens. I'm sorry. You're on. Go ahead. Again, The defendant not to put it in a trivial manner is essentially holding his breath and stomping his feet until he gets this attorney that wouldn't even represent him. Attorney Stratton has steadfastly maintained that he wouldn't have represented him because the money had. I don't know. Counsel. I mean, as judge Krauss pointed out. Well, well, I mean, look, he wanted this thing to move fast. He didn't want this lawyer and he was actually, he, it was actually suggesting going pro pro se. You know, I don't think this is, I mean, was this really, I shouldn't say I don't think, but is this, is this a lot really a larger scheme to, to delay until they hired Stratton? I, you know, Gee, it's tough. I know. And I agree your honor. And, you know, at the end of the day, Your honors, you know, it's your honor's decision at the end of the day as to what this boils down to, but I mean, starting and stopping saying you're ready for trial, then I'm not ready for trial. I'm going to go pro se. I'm withdrawing my request. I mean, we can't ever, you know, know what he was thinking in his mind at the end of the day, but So we have, we have a record where he and his trial attorney and Mr. Stratton are, are all unanimously saying that there is such a breakdown in communication and distrust of, you know, current counsel that he is considering either going pro se as Judge Shugarth noted, or would like to engage Mr. Stratton. I guess I'd like to understand that the Commonwealth's position because Mr. Stratton attempted to put in his notice of appearance and am I mistaken that once he had done that, he couldn't simply withdraw had the court accepted his notice without the court's permission. If, if original appointed counsel was granted leave to withdraw, there would be the problem of leaving, you know, a criminal defendant who was scheduled for trial without an attorney. And obviously he couldn't just be left to himself. I mean, we can get into the waiver, the almost tacit waiver by conduct jurisprudence. I mean, now it's not a defendant. I want to make sure I understand because Mr. Stratton did put in his, his notice of appearance or attempted to was rejected by the, by the court. But having done that, you're suggesting when he found out that the bar wasn't sold or he didn't get paid that he wouldn't represent him, but he, at that point would not be able to withdraw without the court's permission. Isn't that correct? Yes, but the record also demonstrates how much preparation he still would have needed to complete. He did say as to the penalty phase, I'm going to need more expert preparation, mitigation experts as to that than I would in the guilt innocence phase. But he, he, he forwarded a lot of qualified statements saying if notice of alibi was filed, I'll be ready to go. If all these things had happened. And again, that goes back to Sam, Mr. Randolph, just refusing to help his attorney at all. He wouldn't even give him the names of the alibi witnesses during court on the record. And he says, I have an alibi defense. I appreciate that Mr. Stratton indicated he, he wanted to put it in a notice of alibi. He wanted to conduct certain psychiatric evaluation, but the trial court said on the, on the record that it was willing to postpone the actual start of the trial. So to allow him time to get up to speed and, and perhaps undertake some of those steps. So it's not really that delay, which the trial court was willing to countenance this, that is the issue before us. Isn't it simply the delay of, you know, at, at, at best three hours to allow Mr. Stratton to be present for jury selection, a crucial phase of the trial. Sure. Your honor. But I mean, again, attorney Stratton never, he testified that he did sit through the trial, but after that point, he never made his appearance known. He, you know, essentially abandoned his attorney, even though he wasn't technically the attorney, his client at the time. And again, your honors, I just don't think this three hour delay is everything, everything in the record says that that's not what it was going to take and would only further, it could have put his case out months again, prejudicing other interests that offendants interests are certainly. The record is pretty clear. And back to judge Krauss's point, it was a 50 minute delay had, had Mr. Stratton been afforded the opportunity to wait until noon. It really amounted to a 50 minute delay because the jury wasn't brought in until 10 after. Right. So we're talking 50 minutes. And again, not granting that 50 minute continuance. I mean, did that affect attorney Stratton's performance anyways? I mean, if he can get ready in 50 minutes, I mean, he's next. Okay. I understand your position. Thank you, your honors. I guess I don't, I don't want to interrupt you. If you have other things to say on this topic, but you brought up this waiver or forfeiture argument. My, my, my initial question there is the record. Have you, have you actually preserved that argument? I mean, it seems that, well, go ahead. I'll let you answer the question. I'm sorry, your honor. I, I believe one, it was fairly suggested by the whole issue of this case. I mean, we've been talking about his dilatory tactics and the state courts were in the federal courts now, and this is, you know, in our, I would say it was subsumed by our answer and now it's fairly suggested. And, you know, that's why we would be raising it to just, let's be more specific and a little more granular here. I didn't, there was an amended petition. I didn't see any type of a defense except for in your, in your brief recently, that, that there was even a waiver argument or forfeiture argument. So haven't you sort of forfeited the forfeiture argument as it were? I can see where he's coming from that. Your honors, you know, we did raise procedural default, all that stuff in our initial answer that we did file an amended proceedings. I get that. We raised it our earliest opportunity. If it wasn't, if you know, it wasn't fairly preserved. I can understand that our, our argument obviously is that, you know, there was fairly suggested, this is our first opportunity. We didn't initiate the proceedings and, you know, in that procedural default argument and the sixth amendment dilatory tactics argument that it would be fairly suggested. But, but did, did, I guess my, my point is, did judge Connor, have a fair opportunity to consider that argument or are we considering it in the first instance? He didn't, he didn't really go into it in the district court opinion. And I, I wasn't raised to him is really, and I, you know, I was going, kind of going to go there next that it was not brought to his attention in that manner and that proceeding. Thank you. Thank you. Do you have anything else you can add? Nothing on our end, your honor. I'd be happy to answer any and all questions of course. I'd like to ask the same question in terms of forfeiture of, of your argument regarding Teague retroactivity. Where is that raised? TV lane, your honors. Is this with regard to the second issue? Or specifically? Well, you, you raise it in terms of reliance on Gonzalez Lopez, right? You raised it for us. Where is that before the district court? Well, I mean, we didn't, the district court, that was the first time the district court brought up Gonzalez Lopez. So I don't, we couched it in essence that there was this clearly established body of  law. And that there was a, that there was a continuance in bad faith for an attorney. You can't afford that by using Gonzalez, even though it did expressly say that it wasn't using Gonzalez for it could see that, that it wasn't an existence in the realm of law at the time. But however, the court came to its conclusion, you know, to the extent that it relied on Gonzalez, that's kind of where we were on that. Your honors. To what extent do you object to the district court's reliance on Gonzalez Lopez? Reliance seems to be in connection with the, with the district court's conclusion that the Pennsylvania Supreme court's articulation of that, that sixth amendment legal standards was consonant with us Supreme court case law, a position that seems on, it seems to be favorable to you. Yeah, I understand that position as well. Your honor, to the extent that we haven't brought it up, you know, up to this point, we understand that we are at risk for waiver. Okay. Judge Crouse, do you have anything more? Is there any other aspect of the reliance on Gonzalez Lopez that you, you are arguing was error for the district court to rely upon in connection with the difference? No, your honor. Fifth, it's more of an as applied kind of how they applied this case through the lens of that case, your honor. And how they interpreted a sixth amendment right to counsel claims up to that point. Okay. Judge Crouse, any other questions? No, thank you. Okay. Judge Restrepo, do you have any questions? No, thank you. Okay. Thank you counsel. We'll hear from Appellee's counsel. Thank you, your honor. May I please the court, Auden Adjoian on behalf of Appellee Samuel Randolph. As a district court correctly found, there is but one conclusion a reasonable jurist could reach when confronted with the facts of this case. Mr. Randolph was unlawfully denied his sixth amendment right to counsel of choice at his capital trial. The district court appropriately determined that the Pennsylvania Supreme court's opinion, denying relief on his counsel of choice claim was therefore unreasonable under the anti-terrorism and effective death penalty act. The district court likewise correctly concluded that habeas relief was due under DeNova review, referring to such an analysis as a mere formality in light of the clear entitlement to relief that Mr. Randolph has. This court should uphold the district court's detailed well-reasoned opinion and nothing the Commonwealth has suggested offer has offered suggests otherwise. The Pennsylvania Supreme court's direct appeal opinion sanctioned the trial judges decision to force Mr. Randolph to be represented by an unprepared uncommunicative openly antagonistic appointed attorney who was simultaneously running for district attorney of a neighboring County, instead of granting, as this court has acknowledged an incredibly brief continuance that would have permitted Mr. Stratton to begin jury selection and represent Mr. Randolph, Mr. Stratton. I ask you a question. Why didn't the, why didn't Mr. Randolph inform the trial court any earlier that he was trying to retain Mr. Stratton? Your honor. I'm not sure that the record is expressly offers an answer to that one, one way or the other, but as the district court found, that really doesn't make a difference in this case. Most if not all criminal defendants would prefer to retain their own attorney, but for the fact that they can't afford one. So it's hard to see what difference it would have made if Mr. Randolph had said, you know, say in January, when he first contacted Mr. Stratton to the, to the trial judge, I would like to retain my own attorney, but I can't afford to do so right now. You know, it was an indefinite thing at the time because as we know from the record, it was his ability to retain Mr. Stratton was determined that was dependent upon his mother's attorney, his mother's ability to sell the family bar. That's where the money came from to hire Mr. Stratton. Let me ask you a question on that count counsel. Does it matter that it all fell through at the end? Is it relevant? It's absolutely not relevant, your honor. The well, so first of all, just as a factual matter, we know that Mr. Stratton from the habeas hearing and from Mr. Thomas, that the liquor license was in fact sold. So it was partially went through, but regardless, the point of the matter is as judge Krauss indicated before, Mr. Stratton had entered his appearance at that point, he had committed himself. He wasn't going to be able to just pull out saying, you know, sorry, judge. The money didn't come through for me. I don't want to do this after all. So there was not going to be an, an ability for him to do that at that point. It wasn't, you know, again, what we're looking at is what did the trial judge know at the time he rejected Mr. Stratton's enter entry of appearance. And at the time he rejected the continuance motion. And at that time, there was absolutely no reason to think that Mr. Stratton wasn't going to follow through having taken the, the significant step of attempting to enter his appearance. So. Thank you.  Thank you. To judge cigars, his question. He may not have known back in January. Whether this was. Even probable. Or feasible in terms of engaging Mr. Stratton. But there were other developments between January and may. I'm just curious.  there was a lot of information that was available to the jury. And. In the absence of notice to the trial court, at least that the family was attempting. To sell the bar, to raise the funds and to get private counsel. Why wasn't it reasonable for, for the trial court to infer that. Holding that information until two business days before trial. Was. Unfair delay. And putting the jury veneer. To a significant burden. Well, respectfully, your honor. I think that the. We still have to come back to that three hour delay, which was ultimately what was going to be requested. So. None of those factors really impact on the fact that the jury was not   And that that was going to be significantly denied, delayed. And we actually know from the trial judge. Himself. That impact on the jury panel. Wasn't. A part of his calculus, Mr. Welch raised this at the conference call on that Thursday, immediately after Mr. Stratton. Attempted to enter his appearance. Mr. Welch said. Well, the jury panel was in a position to say, we're going to continue to do what we're doing. And essentially. To the trial court. I think it's just a big mistake if we're, you know, thinking about the weighty nature of the right to counsel of choice on the one hand and. You know, the, the inconvenience to the jurors or economics on the other hand, and the trial court said. I want to stop you right there. It's not about that. It's not about the jury panel here. And basically said this case has just been out there. It's old. And did reference the fact that. Mr. Stratton hadn't, or Mr. Randolph hadn't mentioned the attempt to hire Mr. Shred earlier. But again, I just don't see how that connects at all with the decision to deny a three hour delay at that point.   And that's why we're asking for a delay so that Mr. Stratton can conduct jury selection. What about the statement that also appears in the transcript of that hearing? Where the prosecutor indicates that. It's witnesses have been receiving. Threats are being, are being pressured not to testify. And the prosecutor is concerned that that was the real purpose of  And that's why we're asking for a further delay here. Should we infer. That the, that is something that the trial court also took into account. I acting. No, Your Honor. The court should not infer that the trial court certainly never. That is the only thing that appears in the record about that there was no determination. By the trial court or any court that that in fact was happening. The trial court certainly didn't rely on that as a reason. The Pennsylvania Supreme court, which is ultimately the operative opinion that this court is reviewing for purposes of. Review. Certainly said nothing about that as a, as a reason. So. Again, that was the prosecutor's representation. There was no. It was very frankly brief and vague. So there's, there's very little to go on with that. And we, we don't have the state course relying on that. So no. This question. The commonwealth. There's a lot of its argument, as I understand it. To the. Hearings after the fact, what, if any relevance do they. Do they play in our evaluation of this, this issue. So I think that. Minimal, frankly, your honor. I think that the, the appropriate. You know, determination is what the trial court knew at the time. It was making his decision at the time that it rejected. Mr. Stratton's entry of appearance. So I think to the extent that the further hearings sort of are. You know, consistent with everything that was already on the record at that point, Mr. Welch's lack of preparedness, the total breakdown in communications. All of that is consistent and the court can certainly view it for whatever purposes it sees fit. But frankly, all of this was. I mean, all relevant facts were on the record in the pretrial hearings leading up to the continuance. And so this court can. Can very well make all the determinations that needs to make based on what the trial court knew at that time. So. Let me ask you a question. Although Randolph and Welch had a strange relationship, apparently. This new attorney. Thomas and Randolph had a pretty good relationship. How does that factor into our analysis? I think that that is not a particularly salient factor in this course analysis. Mr. Welch was Mr. Randolph's appointed attorney. He was the experienced attorney in this matter. Mr. Thomas was just a couple of years out of law school. He appeared at the arraignment and then was not a part of the defense team up until entering his appearance, basically at trial. The in an earlier pretrial hearing, the trial judge had indicated that it would permit Mr. Thomas to appear so long as he was willing to do so voluntarily. And so, you know, the fact that Mr. Randolph had a, as opposing counsel acknowledged a complete and total breakdown of communication with Mr. Welch. And that Mr. Randolph was in Mr. Welch's words serving as a translator between the two of them. I mean, they weren't even on speaking terms. At the beginning of trial and Mr. Welch was ultimately the attorney who, you know, cross-examined all the, all the Commonwealth's witnesses in their, in their case in chief. So the fact that Mr. Randolph had apparently a better relationship with Mr. Thomas doesn't change this court's analysis whatsoever because, you know, ultimately it was Mr. Randolph's counsel of choice that was, that was denied. It was his, you know, decision to be able to hire Mr. Stratton and have him come represent him in the absence of a, you know, an appropriate basis to overcome the presumption in front in favor of counsel of choice. And that's ultimately where we are. The Pennsylvania Supreme court. Did not point to an appropriate basis to overcome the presumption in favor of counsel of choice, which was long established at the time. It was rendering its decision. And as a result, Mr. Randolph was denied the opportunity and, and, and prejudices presumed. And so that's really. That's really where we're at right now. And that's where we, as far as this court needs to go. We have also argued that the Pennsylvania Supreme court's opinion was an unreasonable application of the facts in light of the state court record under. 28 USD. 2254 D two. The. Pennsylvania Supreme court. Specifically found that the trial court was willing to accommodate Mr. Stratton schedule. And that is just not. Supported by the, by the record. The trial court had indicated that the jury selection process was etched in stone. And even on the very morning of jury selection, when Mr. Thomas is saying to the, to the court. You know, I spoke to Mr. Stratton last night. He still wants to come in and try this case. If he can just get here this afternoon. And your opinion is that the trial court was willing to accommodate Mr. Stratton's. Schedule. If I may just respond to a couple of the suggestions made by opposing counsel about. You know, Mr. Randolph. Being the source of the lack of cooperation here. I'd really just like to highlight the January 31st. Hearing. Because I think that just completely. Undercuts this notion that Mr. Randolph was the one responsible for this breakdown in communication. Mr. Welch did not. I mean, this is on the record of that hearing. Mr. Welch did not even tell Mr. Randolph that that hearing was going to be happening. Which resulted in the trial judge essentially saying I'm not going to, I'm not going to require him to be here. And that was a motions hearing where substantive discussion on the motions that Mr. Welch had filed by that point was happening. Mr. Randolph wasn't present for it because Mr. Welch didn't tell him about it. At the end of that hearing, Mr. Welch revealed privileged communications between himself and Mr. Randolph.  Randolph. Apropos of nothing. And then made an unsolicited comment about how he. You know, writes down his reasons for not doing things for Mr. Randolph in case he wants to come in yelling about ineffectiveness later down the line. Those were Mr. Welch's words. So it's hard to. Imagine how any of that can be laid at the fault that laid at the feet of Mr. Randolph. I mean, he wasn't the one who was, you know, Causing any of that breakdown in communication at that stage. And so his, his comments about Mr. Welch's lack of communication and lack of preparation. Frankly, eminently reasonable. And there's absolutely no reason to think that he was responsible for any, for any of this breakdown. It's, it's, that's just, and of course, the Pennsylvania Supreme court doesn't suggest that Mr. Randolph was responsible for, for the breakdown as, as the court noted, it really doesn't. Acknowledge the breakdown at all or discuss it. Did the trial court judge ever suggested dilatory tactics were being used by Randolph. I believe at one point in it, I believe at one point, at least at one point that the trial judge did say that I, I really think that it's Mr. Randolph who is trying to delay here. But again, as the, as the court noted, Mr. Randolph had repeatedly suggested that he wanted to go to trial as promptly as possible. Even as Mr. Stratton was entering his appearance or attempting to Mr. Randolph was saying, I just want a short continuance. I still want this trial to go forward as quickly as possible. So there's really, you know, if the, if the Pennsylvania Supreme court had relied on dilatory tactics, which, which they didn't, there would be no. Real strong basis for, for, for finding that in the record. But again, I think I know the answer based on your, your current answer, but was there any warning about dilatory tactics? I'm sorry. Was there any warning given by the district judge? About dilatory tactics or was, was this just a mention in passing? By the, by the trial judge. I. The trial judge certainly mentioned it. I cannot. Okay. Recall off the top of my head. If it, if it specifically, if I would characterize it as a warning, you know, the, the trial judge ultimately did not know about. About. Mr. Stratton's attempted entry of appearance until, you know, as we know, Shortly before trial. And so. It's it's hard to see how Mr. Randolph would have been. You know, on notice of, of a warning of needing to accomplish this sooner. And certainly we know that Mr. Stratton entered his appearance immediately upon being, being retained and having the finances come through to his satisfaction. So. He tried, right. But was it rejected? I'm not. Entirely clear on that. The entry of appearance, your honor. Yes. Yes, it was rejected. It was formally, it was formally rejected on the morning of jury selection. On the morning of jury selection,  And there was also a conversation. Basically at the same time that the continuance motion was denied. So. The. The morning of jury selection, Mr. Thomas, basically who is present in the courtroom at that time. Says that he spoke to Mr. Stratton the night, the night before. The trial judge.  At that time, there was also a conversation that was off the record on Friday. But was put on the record that same morning about discussion between Mr. Thomas and, and the trial judge. About this. And so, but that morning. Of jury selection. It was formally rejected. The entry of appearance. Okay. Okay. I don't see judge Krause. He's still with us. These are the hazards of. Oh, here she is. Okay. Great. Judge Krause. Do you have any other questions that you'd like to ask counsel? I. Okay. I, I wonder counsel, if you might briefly address the. Arguments about Gonzalez Lopez that have been raised by your, by your colleague. Both as to. But also as to. Non-retro retroactivity. Yes, absolutely. Your honor. So first as to. At the deference. I'm sorry. At the deference. Again, I don't fully. Necessarily understand the argument as to why Gonzalez Lopez. Would in any way impact on the, at the deference that this court is required to apply as the district court. Specifically. I don't believe that it has anything to do with the deference that this court is required to apply as the district court. It was clearly. Stated. It was only mentioning Gonzalez Lopez to the extent it. Affirmed prior clearly established. Federal law. I don't view Gonzalez Lopez is changing the council of choice inquiry at all. It's still the presumption of council of choice from wheat versus United States.   It's still the presumption of council of choice from the United States. Gonzalez Lopez had nothing to do with a continuance. It was, it was about. An out of district lawyer who was, who was precluded from being. Precluded from entering his appearance. So I really don't see it. To the extent it characterizes the. That the error is structural. So. Two things you're on our first. The Pennsylvania Supreme court just found no error. So it didn't make any sort of prejudice determination at all. So any aspect of Gonzalez Lopez. Wouldn't really. Be relevant to the. Inquiry as to what the Pennsylvania Supreme court found, because there was just absolutely no prejudice discussion there. So.  As a second matter. But as a second matter. You know, Gonzalez Lopez does talk about structural error. This court has long employed structural errors since the 1970s on denial of council of choice. It's going all the way back to. United States versus Laura, which we cited in our brief. Rankin, which is cited in the brief Goldberg. All these cases. And.  there's a lot of evidence to support that these are structural error cases. You know, the United States Supreme court going all the way back to Chapman versus California in the 1960s talks about how a denial of council is, is per se. Error. And. You know, that the Gonzalez Lopez case itself was up on. You know, the, the, the, the, the, the, the, the, the, the, the,  The, the. The, the. Off of a government petition, the eighth circuit below had granted relief under the, the then existing state of the law. So, you know, again, the, the Commonwealth hasn't raised any at any point, either in this court or below. Suggestion that anything but structural error applies appropriately here. So I don't think any of the, the arguments they make about Gonzalez Lopez have any merit. Do I understand your argument correctly, that it only comes up in connection with the DeNovo review portion of. Of the analysis. And at that point, even if it was. Even if, even if. He applies, even assuming this is a. Watershed rule. We. Would treat the. District court's reliance on Gonzalez Lopez. If it were error as homeless error, given. Existing third circuit precedent. Well, so. If I may, your honor. I don't think that it would be a watershed rule issue. It's just not a new rule given, you know, going back to. Chapman versus California going back to. You know, all of this court's precedents, which would be relevant to that analysis as well. It's just not new. So there's no reason why this court wouldn't be able to. Apply that structural error test. But again, I would note that not only has the Commonwealth. Waived. Well, forfeited this argument. They've affirmatively waived it. We have been citing Gonzalez Lopez and arguing structural error. Since the initial habeas petition was filed in the district court in 2007. As you pointed out in our brief, the Commonwealth subsequent to that. Specifically disclaimed any reliance on TIG. They said T versus lane. Is not implicated here. And they had many opportunities to make any sort of an argument as to why structural error doesn't apply. They haven't even done that in this court. So that has just been. Affirmatively waived by the, by the Commonwealth. This court should not. Have any concerns about applying a structural error analysis. If it finds. In terms of this being in new rule, in terms of Supreme court precedent. I would point to two cases, I guess, one Chapman. I mean, And I'm sure others as well, but Chapman is from the 1960s. And it very clearly says that denial of counsel. Is a structural error. And then I would point to. I would point to a case. It's not in the brief, but the eighth circuit below in Gonzalez Lopez pointed to a case called Flanagan versus United States. Which was from the 1980s. That is a case that actually arose out of, out of this circuit, out of this court. And the eighth circuit and Gonzalez Lopez below basically said Flanagan, you know, essentially. Talks about counsel of choice in terms of. A structural error issue. And then of course the Supreme court in Gonzalez Lopez itself says we have no trouble concluding that structural error applies here. So. I just don't think it's a new rule. At all. And so we don't even need to get into fatigue exceptions. But again, I come back to the fact that they have affirmatively waived any reliance on that. On any such argument. I mean, even in argument before the court here today, I don't see why this court would have to go in any different direction. Thank you. Judge Restrepo. Do you have anything more? Nothing further. Thanks. Okay. Hey, thank you. All right, counsel. Well, thank you for your excellent briefing and arguments in this case. We'll take the case under advisement.